BRYAN & HUNTER, plaintiffs in error, *vs.* MARY E. KING, defendant in error.

1. To justify the granting of the injunction in this case, it should have been made distinctly to appear that the money of the wife was put in the firm business without the knowledge or consent of the wife, and as this is not even distinctly stated in the bill, the injunction ought, for this reason, to have been refused.
2. There is nothing in any of the facts, as they appear from the bill, answers and affidavits, to make out a case of constructive notice; nor do the statements in the bill, made as they are on information and belief, or the affidavits, or any of the circumstances, make such a case of notice as justifies the judge, under the positive denials in the answers, in granting the injunction and impounding the proceeds of the factory.
3. As the defendant King, the husband of complainant, was a resident of Pulaski county, and as the property can only be reached by establishing the trust and the complicity of the other defendants with him in the breach of it, the bill was not improperly filed in Pulaski county.

Injunction. Jurisdiction. Venue. Husband and wife. Separate estate. Notice. Before Judge HARRIS. Pulaski county. At Chambers. October 20th, 1873.

This case is sufficiently reported in the opinion.

JACKSON, LAWTON & BASINGER, for plaintiffs in error, submitted the following brief:

I. The demurrer for want of jurisdiction in the court should have been sustained : Code, 4132 ; 27 Ga., 353.

1st. No question of title to land is involved in the controversy : Smith *vs.* Bryan, 34 Ga., 53, 61, 62.

2d. No "substantial relief" is sought against King. The amended bill, pretending to pursue him as the agent of plaintiffs in error, did not give jurisdiction to the court : Taylor *vs.* Cloud, 40 Georgia Reports, 288; Ellis *vs.* Lamar, 44 *Ibid.*, 9. The bill alleges that Bryan & Hunter, the only defendants against whom substantial relief is sought, as also Lamar, are residents of Chatham county.

II. The demurrer to the bill for want of equity should have been sustained. To make out a case for relief against

Bryan & Hunter, the bill should present a clear case as against Clifford A. King. This it has failed to do.

1st. In the allegations that King received the property as her husband, and "her agent," and placed it in the business of Lamar & King, in December, 1870, the bill admits that, so far as third persons might be concerned she had given him absolute control of it: Wylly et al. vs. Collins et al., 9 Ga., 238.

2d. There is no attempt in the bill to resist this conclusion of the law by an averment that King sold the property so received, as her agent, and placed the proceeds of such sales in the business of Lamar & King without her consent. The pleading will be taken most strongly against the pleader. The law presumes that he changed the investment with her consent, and if loss has resulted from the new investment, he is not liable therefor: Campbell vs. Miller et al., 38 Ga., 304.

3d. There is no sufficient charge of fraudulent misapplication of trust fund to warrant the implication of a trust: R. Code, sec. 2290. When fraud is the gravamen of the case, such fraud, in the facts which constitute it, should be plainly, fully and distinctly set out: 3 Hare., 407, 500, 501; 6 How. M. R., 314; Powell vs. Parker et al., 38 Ga., 644, 646; Jones vs. Hodges, 14 Ga., 715, 717. Argumentative and inferential charges are not sufficient: Battle vs. Stephens, 32 Ga., 25, 27.

III. But, even assuming that the bill has made out a clear case of liability as against King, it has failed to extend that liability to Bryan & Hunter. It has not averred notice to them that King had changed the investments of defendant's property without her consent: Connelly vs. Cruger, 40 Ga., 262.

Lanier & Anderson; C. C. Kibbee, for defendant.

McCay, Judge.

1. This case has its origin and its complications from the act of 1866, providing that property coming to the wife dur-

ing coverture shall not go to the husband but to her. Here seems to have been a handsome estate, distributed by agreement among the heirs-at-law to the wife and her husband jointly, as though under the law it belonged to both. It seems to have gone into the hands of the husband without any objection by anybody, and to have been used at his discretion. It was partly in money and partly in property. The wife seems to have joined with her husband in turning the realty into cash, and to have consented that the whole proceeds should go into her husband's hands. He put it as capital into the partnership business of Lamar & King. The money had no ear-marks, and Lamar & King in possession of it were large and apparently responsible dealers in real estate. The world knew nothing of the origin of their resources, and dealt with them as though the capital in their possession was truly theirs. Surely it cannot be contended, because the money on which they traded was in fact the property of King's wife, that all the property passing through their hands is subject to the wife's claim. If the money had been stolen, *this* would not be true, much less can such a claim be set up when it affirmatively appears that the money went into the husband's hands by the wife's consent. The bill does not admit or plainly deny that it was put into the firm business with her consent, though Lamar in his affidavit says in terms that it was. Nor is this statement of Lamar's anywhere denied. If a married woman sees fit to permit her husband to trade upon her money as his own, she must take the consequences. Persons dealing with the husband are not bound to do so at their peril. The wife stands in this respect like anybody else. As to her property she is *sui juris,* and can deal with it as she pleases, subject only to certain provisions provided by law for her protection against her husband. If her means are in money she may spend it, loan it, trade on it, or give it away, as other people may their money. If she trusts her husband with it, she does so at her own risk. If she gives it to him for one purpose, and he applies it to another, she has the same rights as to him, and as to those

dealing with, as other people would have trusting him with money. He is her debtor or her trustee, as he would be the debtor or trustee of others under like circumstances.

If, then, this money was put into the business of the firm by the wife's consent, she is a creditor only of the firm, and has the rights of a creditor. That she is a woman, or the wife of one of the partners, does not make a case of trust different from what it would be if she were a man, or of no kin to either party. It is therefore fundamental in this case that it shall appear that she did not freely loan this money to be put as capital in this business. If she did, it is not a case of trust, but one of the relation of debtor and creditor. And however her husband may be in her debt she has no claim to the title of property passing through the hands of the firm, even though it be bought with the money she loaned. Nor would she have such claim though the purchaser knew that she furnished the means on which the firm was operating. It does not appear by the bill what is the truth as to this matter. She seems to have freely consented to her husband having her money. What he was to do with it she does not say. Lamar says it was there by her consent, and that she was to get a reward of some kind for the use of it. What, he does not say. We think the bill is not sufficiently definite on this vital point to justify the injunction.

2. Assuming, however, that this money went into her husband's hands to be used as her agent and for her benefit, and that its application to the business of the firm was a misuser and a breach of trust, the question arises, what evidence is there that this property was bought by the firm with her money, and if so, what notice did Bryan & Hunter have of this fact? By the statements of the bill most of the money went into the husband's hands late in 1870 and 1871. At the time this property was bought, February, 1872, and January, 1873, the firm had been dealing in real estate, buying and selling, for from one to two years; and when Byran & Hunter lent their credit and took the deeds and gave the bonds, the firm had, in the course of the business, become

indebted to various other persons to the amount of about $24,000 00. Is it at all apparent that this property was bought with *her money*? Is it not on the contrary, very plain that the debts due to G. B. Lamar, to Bishop Persico and to Baldwin, part of the price of this property, were paid, not out of her money but out of the proceeds of Bryan & Hunter's drafts. Nor is it at all apparent that the balance of the consideration paid by the firm for these very lands and factory, was not the proceeds of the debt due to N. A. Hardee & Sons and to Bryan & Hunter, for their previous advancements. Even a *prima facie* case is not made out by showing that early in 1870 the firm got her money. These lands were bought in January, 1873. What losses the firm met with before this, what expenditure of its means had occurred, does not appear. It is, however, a significant fact that at the time the defendants took the deeds and gave the defeasance bonds, the firm was in debt to other persons than Mrs. King, $24,000 00. What right have we to say that Mrs. King's money bought this property rather than the money of their other creditors? The bill does not say in terms that her money bought it. The statement is that her money having gone into the business, it was, after passing through other enterprises, at last invested in these lots and this factory. As we have seen, however, this is plainly not so, as to Lamar's, Persico's and Baldwin's debts, nor is it at all plain that it is true of the remainder of the purchase money. The inference is just as fair that Mrs. King's money was lost as it is that Hardee & Sons' money and the $8,000 00 due Bryan & Hunter was. Clearly Mrs. King would have no right to follow this property on the ground that King & Lamar are her debtors. To make out her case it must appear that *her money*, specifically, was perverted from its proper use by her agent and invested thus. But at last, even if this property, or a portion of it, was in fact bought with Mrs. King's money improperly appropriated by her husband, her right to follow it is still dependent upon notice to Bryan & Hunter of this perversion. What is the evidence of this notice?

1st. The bill so charges. But a reading of the whole bill shows that she makes this charge only on information and belief. A charge so made is not sufficient to justify an injunction, if it be expressly denied in the answer. The other facts from which notice is claimed to be made out, are:

2d. That it was notorious in Savannah that Mrs. King inherited a handsome fortune from her father, and that King, her husband, was in 1870 an applicant to be declared a bankrupt.

3d. It is contended that the paper recorded in the record of deeds of the division, or partial division, of her father's estate, is constructive notice.

4th. It is claimed that the act of Bryan & Hunter in taking the deeds and giving the bonds, and especially in canceling the bonds, in which papers the wives of both King and Lamar were joined, indicated that Mrs. King was supposed to have some interest in these lands.

5th. King's statement, by affidavit, that just before the bonds were canceled, he informed Bryan that he had received a large sum from his wife's estate, and his further statement that he agreed to secure his wife's signature to prevent complications.

It seems to us that as evidence of notice to Bryan & Hunter that these lots and factory were the product of the misapplication by King of his wife's funds, entrusted to him as agent, each and all of these facts are but of trifling moment. Bryan & Hunter expressly deny notice in the answer, though they acknowledge they knew Mrs. King was the daughter of Mr. N. A. Hardee.

Is every man in Savannah to be charged with notice, not only that Mrs. King got a handsome estate on the death of her father, but that her husband was insolvent and was dealing on her funds. It seems to us that this is absurd. In so large a city as Savannah, it would be outrageous to make any assumption of notice from such facts as these. The copy of the division is not, in our judgment, constructive notice; so far as it passes title to the lands of Mr. Hardee, it is notice

of the title. But that it all; it is constructive notice of that but of nothing else. No man is expected to go to the record except to see as to the property he is dealing with. If the title is on record he is charged with notice, because he has no right to deal concerning the land without inquiry.

But there is no law charging a man with *constructive* notice that a woman has a separate estate because there is a deed on record conveying such an estate to her, except so far as to make him deal at his peril with the property described in the deed. The taking of a deed from the partners and their wives and giving a bond of defeasance, and the subsequent cancellation of that bond, was nothing but what the act of 1871 requires when the parties take that method of securing a debt. The statute requires the deed to be signed by the wife, though she may have no separate estate or interest in it. The cancellation of the bond, as it was made to the husbands and wives by the signature of both, has, as we think, no significance as notice of any interest of Mrs. King. There is no pretense that Mrs. Lamar had any interest. Nor does the affidavit of King prove anything more than that after Bryan & Hunter's money had been got and paid out and the deeds been made, and he and Lamar had failed to pay, he told Bryan that he had received a large sum from his wife's estate. Suppose he had, was that any notice to them that he had invested it in these lands, or could that relate back so as to charge Bryan & Hunter with notice at the time their money was advanced? It seems to us that these general facts are nothing to rebut the positive answers of Bryan & Hunter, coupled with the great and admitted facts that at the time the deeds were made Lamar & King owed to other persons a sufficient amount to account for all their dealings without any resort to a suspicion that King was abusing his wife's confidence by the use of her money, and that a large portion of the money advanced by Bryan & Hunter went to pay the debts due for this very property.

We feel sorry for the fate of this lady's fortune; but it is unjust to parties dealing in good faith with this firm to charge

them with notice of Mr. King's misuse of his relations to her on such slight grounds as this record presents. No harm can come from dissolving this injunction. The pending bill is *lis pendens,* and any purchaser of property fully described in the bill is charged with constructive notice of her claim. The remedy of injunction is a harsh one. The impounding of the proceeds of the factory, in effect, stops its operation, for no one will run it under such a limitation of its use.

3. Upon the question of jurisdiction we think the court was right. It is a *sine qua non* in this case to establish the trust in King. He is a necessary party to that issue. The defendants are liable, if at all, only on the ground that they are in complicity with him in his abuse of his wife's trust to him as her agent. The fact of his insolvency does not, in our judgment, alter the case. Legally, his interest is the same, and he is a substantial party, and a substantial decree may be had against him, in the sense of the law. He is not a mere agent, like a sheriff executing a process, but a real party.

Judgment reversed.